# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

MICHAEL J. NEHLS and
KARI NEHLS,

Plaintiffs,

v.                                                          Case No. 25-CV-131

COLE T. PARKER, JOSHUA B. KRICK,
and CORI R. WHIPPLE,

Defendants.

---

## ORDER

---

### 1. Procedural History

Plaintiffs Michael and Kari Nehls bring a Fourth Amendment claim alleging that the Defendants, Officers Cole Parker, Joshua Krick, and Cori Whipple, unlawfully entered their home. (ECF No. 1.) On February 11, 2026, the Nehls filed a Motion for Partial Summary Judgment. (ECF No. 28.) Two days later, the Defendants filed a Motion for Summary Judgment. (ECF No. 32.) All parties have consented to the full jurisdiction of this court pursuant to 28 U.S.C. § 636(c). (ECF Nos. 7, 13.) The court has jurisdiction under 28 U.S.C. § 1331. Both motions have been fully briefed and are ready for resolution.

## 2. Preliminary Matters

The Nehls's submitted Proposed Findings of Fact (ECF No. 30) in support of their Motion for Partial Summary Judgment, to which Defendants responded. (ECF No. 45.) Defendants object to most of the Nehls's Proposed Findings of Fact on the basis that the cited testimony for each fact is incomplete and does not properly support the proposed fact. (*Id*.) Otherwise, Defendants acknowledge these facts are undisputed for the purposes of summary judgment. (*Id*.) While the Nehls's cite only one line of deposition testimony for each proposed fact, the court can ascertain the material supporting each fact from the surrounding lines of deposition testimony.[1] Therefore, the court will consider the Nehls's proposed facts that Defendants acknowledge are undisputed for purposes of summary judgment.

Defendants submitted Proposed Findings of Fact (ECF No. 38) in support of their Motion for Summary Judgment, to which the Nehls responded. (ECF No. 43.) However, the Nehls's responses lack citations to the evidentiary record, as required by the local rules. *See* Civ. L. R. 56(b)(2)(B)(i). For example, several responses simply state that video evidence disputes a proposed fact or assert that "the video speaks for itself," but fail to

---

[1] In the future, Nehls's counsel should cite to all the deposition lines that support each proposed fact and review his submissions for errors before filing them with the court.

2

include any corresponding citations.[2] Other responses "dispute" a proposed fact without referencing any supporting materials.[3]

The court is not required to "wade through improper denials and legal argument in search of a genuinely disputed fact." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). "[A] mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material." *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). Because the Nehls's responses to Defendants' Proposed Findings of Fact do not comply with Civil Local Rule 56(b)(2)(B)(i), the court will consider the Defendants' Proposed Findings of Fact (ECF No. 38) undisputed for purposes of summary judgment. *See Fabriko Acquisition Corp. v. Prokos*, 536 F.3d 605, 607–08 (7th Cir. 2008) (holding that "a court does not abuse its discretion when it opts to disregard facts presented in a manner inconsistent with the rules").

## 3. Facts

On May 28, 2024, Officers Parker and Krick were dispatched to Lincoln Elementary School in Hartford, Wisconsin, to investigate a report of an adult male swearing at staff members. (ECF No. 38, ¶ 6.) Officer Parker arrived at the school around 11:20 a.m. and spoke with Principal Neil Hanlon. (ECF No. 35-1 at 3.) Hanlon informed him that Kelly Koeppen, a teacher at the school, had reported a disorderly conduct incident involving

---

[2] *See e.g.*, ECF No. 43, ¶¶ 38, 41, 44, 49, 59, 60, 61.
[3] *See e.g.*, ECF No. 43, ¶¶ 11, 19, 21, 38, 39, 41, 43, 44, 46–47, 49–51, 53–57, 59–61.

Michael Nehls when Michael arrived to pick up his son. (*Id*.) According to Koeppen's report, Michael confronted her after discovering that notes he had given his son to coordinate play dates had not been distributed. (*Id*.; ECF No. 38, ¶ 18.) Koeppen told Michael that the notes were not approved and that he was on the Tier 2 communication plan, which limited who he could contact and communicate with. (ECF No. 35-1 at 3.) The school had placed Michael on this plan due to previous disorderly behavior. (*Id*.)

Koeppen reported that Michael complained about the Tier 2 communication plan and raised his voice in a hostile manner. (ECF No. 35-1 at 3.) She then told Michael that she was done discussing the issue and that he could speak with Principal Hanlon instead. (*Id*.) In response, Michael said, "Fuck Tier 2, I'm fucking talking to you." (*Id*.) Koeppen stated that she felt threatened by Michael and was concerned for her safety, so she went into the school and shut the door behind her. (*Id*.) The school requested that a complaint for disorderly conduct be made against Michael for his behavior. (ECF No. 38, ¶ 23.)

After concluding the investigation at the school, Officers Parker and Krick, together with the school resource Officer Cori Whipple, met at the Hartford Police Department to discuss their next steps. (ECF No. 38, ¶¶ 24, 26.) Officer Parker, who led the investigation, decided to visit Michael's residence to speak with him about his behavior at the school. (*Id*., ¶¶ 7, 25.) Officers Krick and Whipple accompanied Officer Parker for safety. (*Id*., ¶ 28.)

According to Officer Parker's body camera footage, the officers arrived at Michael's residence around 1 p.m. (ECF No. 35-2 at 0:10.) Officer Krick positioned himself at the side of the house, while Officer Whipple took up position at the rear. (ECF No. 38, ¶ 27.) Officer Parker approached and knocked on the front door. (*Id*.) Kari Nehls answered the door. (*Id*., ¶ 29.) Officer Parker told Kari that he needed to speak with Michael about an incident at the elementary school. (ECF No. 38, ¶ 30.) Kari responded that she would check to see if Michael was home and then she closed the front door. (ECF No. 35-2 at 3:10–15.) While waiting for Michael to come to the door, Officer Parker told Officer Krick, "If he doesn't come out, I'll just tell her I'll have to apply for, I'll have to call, I'll have to get a warrant, and I know he's in there." (*Id*. at 4:25–33.)

A few minutes later, Michael began speaking through the doorbell camera. (ECF No. 35-2 at 6:45.) Officer Parker informed Michael that he needed to come outside so they could discuss the incident at the school and so Officer Parker could verify his identity. (*Id*. at 7:10–25.) Shortly thereafter Michael came to the front door. (*Id*. at 8:28; ECF No. 38, ¶ 32.) He opened the interior door but kept the glass storm door closed. (*Id*. at 8:28; ECF No. 38, ¶ 32.)

Upon seeing Michael through the glass storm door, Officer Parker instructed him to come outside. (ECF No. 35-2 at 8:30–35.) Michael replied, "no thank you," and asked Officer Parker what he needed. (*Id*. at 8:30–35.) Officer Parker then repeatedly asked Michael to step outside so they could talk about what happened at the elementary school.

(*Id*. at 8:46–9:11.) Michael refused and continued the conversation through the glass storm door. (*Id*. at 8:46–9:11.) Officer Parker then asked Michael what transpired between him and a teacher at the school. (*Id*. at 9:20–23.) Michael responded they had a "freedom of speech conversation." (*Id*. at 9:23–26.)

Officer Parker asked Michael what the conversation with the teacher was about. (ECF No. 35-2 at 9:40–44.) Michael then held up his pointer finger, mumbled something, and stepped back from the door. (*Id.*) As Michael moved away, Officer Parker opened the glass storm door, instructed Michael not to walk away, and placed his hand on the interior door to keep it open. (*Id*. at 9:44–49.) Michael said he was going to get a piece of paper, but Officer Parker informed him that he was a suspect in an investigation and was not free to leave. (*Id*. at 9:50–55.) Michael again stated, "I'm going to get a piece of paper, just wait please." (*Id*. at 9:59–10:02.) Officer Parker continued to instruct Michael to come outside and stated, "I'm ordering you outside the house, or I'm going to take you outside the house." (*Id*. at 10:02–10.)

At this point, Officer Krick, who was standing behind the front porch, said: "tell him he's under arrest." (ECF No. 36-2 at 9:55–58.) Officer Parker then told Michael that he was under arrest and simultaneously entered the house. (ECF No. 35-2 at 10:10–14.) Officers Krick and Whipple entered the house a few seconds later. (ECF No. 36-2 at 10:00–05.) Officer Parker grabbed Michael's arm, but Michael pulled away and attempted to go

upstairs. (ECF No. 35-2 at 10:13–19; ECF No. 38, ¶ 48.) Officers Krick and Whipple then helped Officer Parker arrest Michael. (ECF No. 35-2 at 10:19–11:45; ECF No. 38, ¶ 63.)

On May 30, 2024, a criminal complaint was filed against Michael. (ECF No. 27-1; ECF No. 38, ¶ 69.) Michael was charged and convicted of disorderly conduct based on his behavior at Lincoln Elementary School. (ECF No. 27-1 at 1.)

### 4. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable factfinder could return a verdict for the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).

"The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment: a court construes facts and inferences arising from them in favor of the party against whom the motion under consideration is made." *Cook v. Greenwood Hosp. Mgmt., LLC*, 704 F. Supp. 3d 874, 877 (E.D. Wis. 2023) (citing *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017)). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence

submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016).

**5. Analysis**

The Nehls contend that Officers Parker, Krick, and Whipple entered their home without a warrant in violation of the Fourth Amendment. (ECF No. 29 at 1.) Defendants argue that the officers' entry was justified by exigent circumstances. (ECF No. 33 at 1.) Specifically, Defendants claim that Michael posed a flight risk and a danger to others. (*Id.* at 12.) Defendants also argue that they are entitled to qualified immunity. (*Id.* at 14.)

Although the Nehls' summary judgment brief asks the court to find that Officers Parker, Krick, and Whipple unlawfully detained Michael after entering their home (ECF No. 29 at 11), they previously stipulated that their only claim against Defendants is for alleged unlawful entry in violation of the Fourth Amendment. (ECF No. 16 at 1.) Therefore, the court will only consider arguments related to the unlawful entry claim.

Defendants reassert their argument that the Nehls' claims are barred by the *Heck* doctrine. (ECF No. 33 at 8.) However, the court already addressed this issue in a previous order (ECF No. 41), denying Defendants' motion to stay (ECF No. 25). Michael's conviction for disorderly conduct does not conflict with the Nehls's unlawful entry claim. (ECF No. 41 at 4.) The court will not revisit this argument.

**5.1. Exigent Circumstances**

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Physical entry of the home is the "chief evil" the Fourth Amendment was intended to prevent. *United States v. United States District Court for the Eastern Dist. of Mich.*, 407 U.S. 297, 313 (1972). Generally, law enforcement officers must obtain a judicial warrant before entering a home without consent. *Mincey v. Arizona*, 437 U.S. 385, 393–94 (1978). Exceptions to the warrant requirement are "few in number and carefully delineated" and a presumption of unreasonableness attaches to all warrantless home entries. *United States District Court for the Eastern Dist. of Mich.*, 407 U.S. at 318; *see also Payton v. New York*, 445 U.S. 573, 586 (1980).

Exigent circumstances justify a warrantless entry when "the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable." *Mincey*, 437 U.S. at 394 (citing *McDonald v. United Sates*, 335 U.S. 451, 456 (1948)). Under this doctrine, "[l]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). In some circumstances, officers may also make a warrantless entry to engage in the "hot pursuit" of a fleeing suspect. *United States v. Santana*, 427 U.S. 38, 42 (1976); *see also Lange v. California*, 594 U.S. 295, 302 (2021) (explaining that the exigent-circumstances exception is

applied on a case-by-case basis, requiring courts to "examine whether an emergency justified a warrantless search").

A court's "[a]nalysis of the reasonableness of police officers' exigency determination is entirely objective; it considers only what they reasonably should have known at the time of their warrantless home entry." *Hawkins v. Mitchell*, 756 F.3d 983, 992 (7th Cir. 2014) (citing *United States v. Venters*, 539 F.3d 801, 807 (7th Cir. 2008)). The government bears the burden of establishing exigency, and the presumption against warrantless entry is difficult to overcome "'when the underlying offense for which there is probable cause to arrest is relatively minor.'" *Hawkins*, 756 F.3d at 992 (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984)).

Defendants contend that Officer Parker's entry into the Nehls's home was justified by exigent circumstances because he believed Michael might "barricade himself inside the house, turn into a danger to the community, put his neighbors or officers in danger, or create a situation where SWAT needed to be called in." (ECF No. 33 at 12.) Although Officer Parker had never met Michael or Kari Nehls before this incident, Defendants assert that, at the time of entry, Officer Parker was aware that Michael had a history of disorderly behavior. (ECF No. 34-1 at 1–5; ECF No. 38, ¶ 12.) This knowledge was based on the recent investigation at Lincoln Elementary School and records from the Hartford Police Department documenting over 40 complaints involving Michael and disputes with neighbors or incidents of disorderly conduct. (ECF No. 34-1 at 9:20–10:4.)

Defendants cite *United States v. Santana*, 427 U.S. 38 (1976), and *United States v. Lenoir*, 318 F.3d 725 (7th Cir. 2003), to support their argument that exigent circumstances justified Officer Parker's entry into the Nehls's house. (ECF No. 33 at 12–13.) In *United States v. Santana*, officers conducted an undercover heroin buy from Patricia McCafferty. 427 U.S. at 39. After officers arrested McCafferty, she told them that "Mom Santana" had the money from the buy. *Id.* at 40. The officers went to Santana's home and saw her standing in the doorway holding a brown paper bag, which they suspected contained drugs. *Id*. As the officers approached, Santana retreated into the vestibule of her home, and the officers followed and arrested her. *Id*. at 41.

The United States Supreme Court held that, when the officers arrived, Santana was in a "public" place by standing in her doorway, as she was "exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." *Santana*, 427 U.S. at 42. The Court further held that the officers' warrantless entry was justified as "hot pursuit" because, after Santana saw the officers and retreated into her home, there was a genuine concern that "any delay would result in destruction of evidence." *Id*. at 43. The Court concluded that "a suspect may not defeat an arrest which has been set in motion in a public place" by retreating into their home. *Id*. at 42–43.

In *United States v. Lenoir*, an officer received a report about an unidentified male with a gun in a high-crime neighborhood. 318 F.3d at 727. The officer saw Kenneth Lenoir in the area with a shotgun and a rifle protruding from his coat and called for backup. *Id*.

As police cars approached, Lenoir fled into a nearby home. *Id*. An officer pursued Lenoir inside the home and apprehended him. *Id*. A second officer entered a few seconds behind the first. *Id*. The Seventh Circuit Court of Appeals held that exigent circumstances justified the officers' entry because they did not know that Lenoir—who was armed—was entering his own home, and therefore "reasonably feared for the safety of occupants in the home and for their own safety, especially given Lenoir's intoxicated state." *Id.* at 730.

In this case, Officer Parker was investigating Michael for disorderly conduct, a misdemeanor under Wisconsin law, and he knew this was Michael's home. *See* Wis. Stat. § 947.01(1); *see Lenoir*, 318 F.3d at 730 (explaining that, "had the officers known that the defendant actually lived there, they would have needed a warrant to enter"). During his conversation with Officer Parker, Michael never stepped outside his home; he remained behind the glass storm door the entire time. (ECF No. 35-2 at 8:29–10:15.) Thus, his arrest was never "set in motion in a public place." *Santana*, 427 U.S. at 43. Defendants fail to explain how Officer Parker could have reasonably believed Michael was a flight risk given that Michael remained inside his home the entire time.

Additionally, Koeppen's report did not state that Michael had been physically violent or possessed a weapon. (ECF No. 35-1 at 3.) She reported feeling threatened and concerned for her safety because Michael raised his voice at her in a hostile manner. (*Id*.) Defendants argue that Officer Parker knew about prior complaints made to the police

department regarding Michael and alleged physical threats; however, they do not explain how these complaints provided Officer Parker with any objective reason to believe that Michael posed a safety risk on this occasion. (ECF No. 33 at 12); *see Hawkins*, 756 F.3d at 993 (holding that a warrantless home entry in response to a domestic dispute report was unreasonable when officers were "advised that no physical attack had occurred that night").

Exigent circumstances are difficult to establish when the underlying offense is minor and, "when the officer has time to get a warrant, he must do so." *Hawkins*, 756 F.3d at 992; *see also Lange*, 594 U.S. at 313. Here, the suspected crime was minor and there was no reason Officer Parker could not have obtained a warrant to arrest Michael before entering his home. *See Welsh*, 466 U.S. at 753 (holding that "the exigent-circumstances exception in the context of home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense … has been committed"). Any claimed "exigency" was precipitated when Officer Parker opened the glass storm door and blocked Michael from closing his interior door. *See Kentucky v. King*, 563 U.S. 452, 469 (2011) (holding that "the exigent circumstances rule applies when the police do not gain entry to premises by means of an actual or threatened violation of the Fourth Amendment"). Even accepting Defendants' version of events, these facts do not justify the conclusion that Officer Parker's entry was warranted by exigent circumstances.

Defendants also argue that Officer Krick and Whipple's warrantless entry was justified by exigent circumstances. (ECF No. 33 at 13–14.) They claim the officers entered the Nehls's home to assist Officer Parker in arresting Michael and ensuring the safety of everyone involved. (*Id*. at 14.)

A few minutes before Officer Parker entered the house, Officer Krick was standing behind the front porch and Officer Whipple was at the side of the house. (ECF No. 36-2 at 9:46–56; ECF No. 37-2 at 9:41–56.) As Officer Parker ordered Michael to come outside, Officer Krick told Officer Parker to tell Michael that he was under arrest. (ECF No. 36-2 at 9:56–58.) Officer Parker then told Michael he was under arrest and entered the house at the same time. (*Id*. at 9:56–10:00.) Officers Krick and Whipple entered the house just seconds later. (*Id*. at 9:58–10:05; ECF No. 37-2 at 9:57–10:01.)

Neither Officer Krick's nor Officer Whipple's body camera footage shows a physical altercation between Officer Parker and Michael *before* the officers entered the house. (ECF No. 36-2 at 9:58–10:05; ECF No. 37-2 at 9:57–10:01.) Therefore, it is unclear how either officer could have observed a physical altercation between Officer Parker and Michael prior to their entry. Officer Krick also testified that he never saw Michael before entering his house and that, from his position, he could not see directly into the house. (ECF No. 34-2 at 10:6–16.) Similarly, Officer Whipple testified that he did not see anyone inside the house before entering. (ECF No. 34-3 at 15:2–5.)

Based on these facts, Defendants fail to explain how Officer Krick or Officer Whipple could have reasonably believed entering the Nehls's residence was necessary to ensure the safety of everyone involved. *See United States v. Medina*, No. 8-CR-231, 2011 U.S. Dist. LEXIS 25597, at *23 (E.D. Wis. Jan. 13, 2011) (noting that the "exigent circumstances standard requires more than not knowing if an individual will cause harm or present a threat to officer safety"). Officers Krick and Whipple had the same information as Officer Parker and thus had no objective reason to believe Michael posed a safety risk to anyone. This situation did not present a "compelling need for official action [with] [no] time to secure a warrant." *Venters*, 539 F.3d at 807.

Absent exigent circumstances, the entry of Officers Parker, Krick, and Whipple into the Nehls's home was unreasonable. *See Welsh*, 466 U.S. at 750 (citing *Payton*, 445 U.S. at 586 (explaining that "the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries"). Therefore, Defendants' request for summary judgment, arguing that exigent circumstances justified the entries of Officers Parker, Krick, and Whipple, is denied.

### 5.2. Qualified Immunity

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *White v. Pauly*, 580 U.S. 73, 78

(2017)). The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In evaluating qualified immunity claims, courts ask whether the disputed conduct violates a constitutional right and whether that right was "clearly established" at the time of the alleged conduct. *Wernsing v. Thompson*, 423 F.3d 732, 742 (7th Cir. 2005) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). In other words, "[t]he principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson*, 555 U.S. at 244. The unlawfulness of the officer's actions must have been "apparent" under pre-existing law. *White*, 580 U.S. at 80. "This sounds like a high bar because it is—qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Doxtator v. O'Brien*, 39 F.4th 852, 863 (7th Cir. 2022) (brackets and quotation marks omitted) (quoting *Lopez v. Sheriff of Cook Cnty.*, 993 F.3d 981, 988 (7th Cir. 2021)).

The Supreme Court has repeatedly stressed "the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" *White*, 580

U.S. at 79 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). "Otherwise, '[p]laintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" *White*, 580 U.S. at 79 (ellipses in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). Although this "'does not require a case directly on point' for a right to be clearly established, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *White*, 580 U.S. at 79 (internal quotation marks and brackets omitted) (quoting *Mullenix*, 577 U.S. at 12); *see also Weiland v. Loomis*, 938 F.3d 917, 920 (7th Cir. 2019) ("A principle can be clearly established without matching a later case's facts. The search is for an appropriate level of generality, not the most particular conceivable level." (emphasis in original)).

"Ordinarily, to show that the law was 'clearly established,' plaintiffs must point to a 'closely analogous case' finding the alleged violation unlawful." *Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018) (quoting *Findlay v. Lenderman*, 722 F.3d 895, 899 (7th Cir. 2013)). But "[i]n some rare cases, where the constitutional violation is patently obvious, the plaintiffs may not be required to present the court with any analogous cases." *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000). In these cases, a "plaintiff[] can demonstrate clearly established law by proving the defendant's conduct was 'so egregious and unreasonable that … no reasonable [official] could have thought he was

17

acting lawfully.'" *Reed*, 906 F.3d at 547 (quoting *Abbott v. Sangamon County*, 705 F.3d 706, 724 (7th Cir. 2013)).

Defendants argue that they are entitled to qualified immunity because, even if Officers Parker, Krick, and Whipple violated the Nehls's Fourth Amendment rights, those rights were not clearly established at the time of the alleged incident. (ECF No. 33 at 17.) The Nehls respond that the Fourth Amendment's protection against warrantless entry into the home—and the right to retreat into one's own home and be free from unreasonable government intrusion—was clearly established. (ECF No. 42 at 6.)

As stated above, Officers Parker, Krick, and Whipple violated the Nehls's Fourth Amendment rights by entering their home without consent, a warrant, or exigent circumstances. *See Caniglia v. Strom*, 593 U.S. 194, 198 (2021) (reaffirming that the "very core" of the Fourth Amendment is "'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion'") (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013)). The question is whether those rights were clearly established when the officers entered the Nehls's home.

Defendants cite *Stanton v. Sims*, 571 U.S. 3 (2013), and *White v. Stanley*, 745 F.3d 237 (7th Cir. 2014), to support their argument that they are entitled to qualified immunity. (ECF No. 33 at 18–20.) In *Stanton*, an officer responded to a reported disturbance involving a person with a baseball bat in a high-crime area. 571 U.S. at 4. Upon arriving, Officer Mike Stanton observed three men walking along the street. *Id.* Two of the men

entered a nearby apartment complex, while the third, Nicholas Patrick, ran/walked quickly toward a residence. *Id*. Finding Patrick's behavior suspicious, Officer Stanton ordered him to stop. *Id*. Patrick ignored the command and entered the front gate of the residence, blocking Officer Stanton's view of him. *Id*.

Believing Patrick had committed a misdemeanor by disobeying his order, Officer Stanton kicked open the gate. *Stanton*, 571 U.S. at 4–5. Unbeknownst to him, the homeowner, Drendolyn Sims, was standing behind the gate and was injured when it flew open. *Id*. at 5. The United States Supreme Court held that Officer Stanton was entitled to qualified immunity for Sims's injuries because, at the time of the incident, "the law regarding warrantless entry in hot pursuit of a fleeing misdemeanant" was not clearly established. *Id*. at 10.

In *White v. Stanley*, officers went to James White's house to arrest his girlfriend for stealing a vehicle registration sticker—a felony in Illinois. 745 F.3d at 238. White opened the door but refused to allow the officers inside without a warrant. *Id*. While speaking with White, the officers smelled marijuana coming from inside the house. *Id*. When White tried to close the door and retreat inside, an officer blocked it from closing. *Id*. at 239. The officers then entered, tackled White on the stairs, and arrested him for resisting or obstructing a peace officer. *Id*. The Seventh Circuit Court of Appeals held that the officers were entitled to qualified immunity because, at the time of entry, it was not sufficiently

clear whether entering a home after smelling burning marijuana violated the Fourth Amendment. *Id*. at 242.

In this case, the officers arrived at the Nehls's residence to investigate a disorderly conduct complaint that had occurred at Lincoln Elementary School at least an hour before their arrival. (ECF No. 35-1; ECF No. 35-2 at 0:10.) There were no reports of Michael being physically violent, nor were there any facts suggesting he posed an immediate danger to the community if not immediately arrested. (ECF No. 35-1.)

The Nehls's case more closely resembles *Hawkins v. Mitchell*, 756 F.3d 983 (7th Cir. 2014). In *Hawkins*, Officers Rodney Mitchell and James Bowersock responded to a 911 call regarding a domestic dispute between Sarah Bumgarner and William Hawkins. 756 F.3d at 987. On their way to Hawkins's house the officers learned that Bumgarner and Hawkins had been drinking and got into a verbal argument. *Id*. at 988. Although Hawkins had a history of abusiveness, there were no reports of physical violence or threats that night. *Id*. at 987–88. Officer Mitchell arrived first and observed Hawkins outside yelling at Bumgarner about her keys. *Id*. at 988. Hawkins then went inside and Bumgarner told Officer Mitchell she was not injured, but that Hawkins had her keys so she could not leave. *Id*.

When Officer Mitchell knocked on Hawkins's door, Hawkins opened the door and shouted, "I don't need to talk to you!" *Hawkins*, 756 F.3d at 988. When Hawkins tried to close the door, Officer Mitchell blocked it with his foot and entered the home, telling

Hawkins he just wanted to talk. *Id*. Hawkins called his attorney, who advised him that he was not required to speak with Officer Mitchell and that Mitchell had no right to be in his house. *Id*. Following this advice, Hawkins told Officer Mitchell to leave his house. *Id*.

When Officer Bowersock arrived, Officer Mitchell motioned him inside the house. *Hawkins*, 756 F.3d at 988. Hawkins was still on the phone with his attorney and continued telling Officer Mitchell to get out. *Id*. Officer Bowersock explained that they were investigating a 911 call about a domestic dispute and instructed Hawkins to get off the phone and talk to them. *Id*. When Hawkins refused, Officer Bowersock told him he was under arrest. *Id.* The officers each grabbed one of Hawkins's wrists, and a physical altercation ensued. *Id*.

The Seventh Circuit Court of Appeals held that exigent circumstances did not justify Officer Mitchell's warrantless, nonconsensual entry, since there was no evidence Hawkins had threatened to physically harm anyone. *Hawkins*, 756 F.3d at 993. The court also held that Officer Bowersock's entry was unlawful, because he should have known that no exigent circumstances existed. *Id*. at 994 (explaining that "the lack of weapons, threats, or physical aggression from Hawkins left time for Bowersock to ask Mitchell why they were inside and to recognize the absence of any possible justification for staying"). In discussing Officer Bowersock's unreasonable entry, the Court noted it was significant that he did not argue he was protected by qualified immunity. *Id*. at 994 n.6.

At the time Officer Parker entered the Nehls's home, it was clearly established that an officer may not enter a residence without consent, a warrant, or exigent circumstances. *See Hawkins*, 756 F.3d at 999; *see also United States v. Berkowitz*, 927 F.2d 1376, 1388 (7th Cir. 1991) (holding that "if police go to a person's home to arrest him, and have reason to believe they may have to enter the home to make the arrest, they should obtain a warrant"). Officer Parker should have recognized that Michael was entitled to close his door and not talk to him. *See Berkowitz*, 927 F.2d at 1387 (explaining that "society would recognize a person's right to choose to close his door on and exclude people he does not want within his home"). Although warrantless entries for misdemeanor conduct may be justified to prevent imminent violence, destruction of evidence, or escape, none of those circumstances were present here. *See Lange*, 594 U.S. at 313. A reasonable officer in this situation would have understood that, absent exigent circumstances, a warrant was required to enter the Nehls's home. *See Owusu v. Grzyb*, 749 F. Supp. 897, 905 (N.D. Ill. 1990) (denying qualified immunity where officers entered a home to investigate a guardianship matter without consent, a warrant, or exigent circumstances). As a result, Officer Parker is not entitled to qualified immunity.

Officers Krick and Whipple are likewise not entitled to qualified immunity because they had the same information as Officer Parker at the time of entry. *See Holt* v. *Lewsader*, No. 18-CV-2169, 2020 U.S. Dist. LEXIS 258256, at *46 (C.D. Ill. Sept. 30, 2020) (citing a consensus of decisions holding that "an officer's subsequent entry into the home

is unlawful where the officer knows the initial entry is unlawful"). They knew Michael was suspected only of disorderly conduct more than an hour before, that no reports indicated he was physically violent, and there was no evidence suggesting he might attempt to flee. And as previously explained, neither Officer Krick nor Whipple observed anything that would lead a reasonable officer to conclude there was an ongoing emergency. Officer Parker's unconstitutional conduct did not absolve Officer Krick and Whipple of their independent responsibility to determine whether their own entry was lawful. *See McInerney v. King*, 791 F.3d 1224, 1238 (10th Cir. 2015) (denying qualified immunity for backup officers' entry into the plaintiff's home because they had the same information at the time of entry as the initial, unlawfully entering officer).

Therefore, the court finds that the right at issue was clearly established, and Officers Parker, Krick, and Whipple are not entitled to qualified immunity on the Nehls's unlawful entry claims.

## 6. Conclusion

**IT IS THEREFORE ORDERED** that the Nehls's motion for partial summary judgment (ECF No. 28) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment (ECF No. 32) is **DENIED.**

The clerk of courts shall schedule a status conference to discuss how the case will proceed.

Dated at Milwaukee, Wisconsin this 28th day of May, 2026.

_____
WILLIAM E. DUFFIN
U.S. Magistrate Judge